<div style="text-align:center;color:red">**CORRECTED**</div>

# In the United States Court of Federal Claims

No. 17-487 V
Originally Filed: August 27, 2021
Reissued: October 19, 2021[1]

|                                    |   |
|---|---|
| BARBARA PERKINS,                   | ) |
|                                    | ) |
| *Petitioner*,                      | ) |
|                                    | ) |
| v.                                 | ) |
|                                    | ) |
| SECRETARY OF HEALTH                | ) |
| AND HUMAN SERVICES,                | ) |
|                                    | ) |
| *Respondent*.                      | ) |

*Lawrence G. Michel*, Kennedy Berkley Yarnevich & Williamson, Salina, KS, for Petitioner.

*Mallori B. Openchowski*, Trial Attorney, United States Department of Justice, Torts Branch, Civil Division, Washington, D.C., for Respondent.

**OPINION AND ORDER**

Pending before the Court is a motion for review of the Special Master's onset ruling in this vaccine injury case. Because the Special Master thoroughly reviewed the Petitioner's medical records, witness affidavits, and live testimony, and carefully explained and documented her decision, the Court upholds the Special Master's findings of fact and conclusions of law and sustains the Special Master's decision.

**I.     BACKGROUND**

   **A.     Medical History**

Prior to the events at issue, Petitioner Barbara Perkins ("Mrs. Perkins") was generally healthy, with a medical history significant for recurrent sinusitis and seasonal allergies. ECF No. 60 at 5; ECF No. 70 at 3; ECF No. 8-6 at 1587, 1590. On November 2, 2015, prior to visiting a new grandchild, Mrs. Perkins got a Tetanus-diphtheria-acellular pertussis ("Tdap") vaccination.

---

[1] Pursuant to Vaccine Rule 18, included in Appendix B of the Rules of the Court of Federal Claims, the Court issued its decision under seal to provide the parties an opportunity to submit redactions. The parties did not propose any redactions. Accordingly, the Court publishes this decision.

ECF No. 8-6 at 1591. Approximately two months later, on January 4, 2016, Mrs. Perkins visited Siena Medical Clinic ("Siena") complaining of ear and sinus problems. *Id.* at 1587. During this visit, Mrs. Perkins reported being "ill for about 1 week." *Id.* A physical examination revealed that Mrs. Perkins was in no acute distress, and records state that she was neurologically intact. *Id.* At this time, Mrs. Perkins was prescribed a Z-pak for "Acute suppurative bilateral otitis media without rupture." *Id.* According to the records, Mrs. Perkins "does request this type of antibiotic due to past experience with good effectiveness." *Id.* at 1586.

On January 6, 2016, Mrs. Perkins visited the St. Catherine's Hospital ("St. Catherine's") emergency room "complaining of ear pain, dizziness, and double vision." ECF No. 8-4 at 1298. Mrs. Perkins reported that her "[s]ymptoms began approximately one week ago with a sore throat while she was traveling in Seattle. Approximately 5 or 6 days ago she began to experience bilateral ear pain . . . ." *Id.* This ear pain had "worsened over the past several days." *Id.* Mrs. Perkins also complained of "dizziness, ataxia, worsening ear pain and subjective fevers. She also complain[ed] of diffuse tingling throughout her entire body as well as double vision," but she denied focal weakness or numbness. *Id.* A CT scan of her head showed bilateral mastoid effusions. *Id.* at 1299-1300. Mrs. Perkins was admitted for inpatient treatment at St. Catherine's for bilateral mastoiditis and otitis media with labyrinthitis. *Id.* at 1316. The same day, Mrs. Perkins developed increased numbness of her entire body, particularly her face to jaw. *Id.* at 1414. Thereafter, doctors ordered neurological checks. *Id.* Mrs. Perkins underwent an MRI of her brain on January 7, 2016, which showed "no restricted diffusion to suggest recent ischemic injury," and several areas of "moderate to severe inflammatory mucosal thickening" in sinus and ear. *Id.* at 1324-25. Because she appeared responsive to treatment, Mrs. Perkins continued on steroids, Rocephin, and Vancomycin. *Id.* at 1378. Although there was concern about Mrs. Perkins' ataxia, her diagnosis remained bilateral mastoiditis. *Id.* at 1378.

Mrs. Perkins transferred to Porter Adventist Hospital ("Porter") on January 8, 2016. ECF No. 8-4 at 1414. Her transfer was because St. Catherine's did not have a neurologist or an Ear Nose and Throat ("ENT") specialist to treat her. *Id.* at 1290. Mrs. Perkins' discharge summary states that at her discharge, she had been experiencing "a 3-day history of some peculiar neurological changes." *Id.* At the time of her admission to Porter, Mrs. Perkins' chief complaints were double vision and mastoiditis. ECF No. 8-2 at 493. Her intake history states that "[s]he feels that her vision is worsening and her weakness has progressed significantly . . . . She does note that at times she has shaking and uncontrollable twitches . . . . She feels that her speech is off, that she has a little bit of a lisp that she does not usually have . . . ." *Id.* The initial assessment was otitis media and sinusitis "associated with rather prominent neurological changes." *Id.* at 495.

A neurological examination at Porter showed that Mrs. Perkins was not able to move her eyes in either direction or look up or down, as well as 4/5 strength in both upper extremities and bilateral lower extremity weakness in her hip flexors and quadriceps. ECF No. 8-2 at 508. Upon examination, the impression was "autoimmune process likely Guillain-Barre with Miller Fisher variant." *Id.* On January 19, 2016, Mrs. Perkins transferred from Porter to an inpatient rehabilitation facility. The Porter discharge note recorded that Mrs. Perkins likely had the Miller-Fisher variant of Guillain-Barre Syndrome ("GBS"). *Id.* at 485. On February 6, 2016, Mrs. Perkins was discharged from inpatient rehabilitation with outpatient physical and occupational therapy recommended. ECF No. 8-1 at 8-11.

2

Petitioner began outpatient physical therapy on February 8, 2016, where her rehabilitation plan states that her onset date was January 1, 2016 (presumably based on what Mrs. Perkins reported to her therapists). ECF No. 8-4 at 1251. On February 12, 2016, Mrs. Perkins visited Siena to establish treatment with a primary care doctor, Dr. Rosin. ECF No. 8-6 at 1582. Dr. Rosin increased Mrs. Perkins' physical therapy from three to five times per week and recommended a follow-up appointment in two months. *Id.* at 1583.

On February 29, 2016, Mrs. Perkins went to the ER for ear pain. ECF No. 8-4 at 1231. Upon examination, Mrs. Perkins was diagnosed with acute suppurative otitis media without illnesses. *Id.* That same day, Mrs. Perkins returned to Siena for an evaluation of left-sided otalgia. ECF No. 8-6 at 1579. The visit history notes: "She is quite anxious because she believes that bilateral otitis media was the cause of her Guillain-Barre Syndrome a few months ago." *Id.* Dr. Rosin instructed her to keep foreign bodies out of her ears and to finish the Ciprodex that was prescribed at the ER. *Id.* at 1580. Her GBS was "steadily improving" and required no additional treatment. *Id.*

On April 13, 2016, Mrs. Perkins visited Siena for a routine follow up. ECF No. 8-6 at 1573. She had no new neurological concerns. After April 13, 2016, approximately five and a half months following Mrs. Perkins' Tdap vaccination, the medical records show no further treatment for GBS. ECF No. 60 at 9. According to the medical records, Mrs. Perkins sought no further medical care over the next fifteen months. Further records show only massage therapy and chiropractic visits in 2017 following a car accident. ECF No. 21-2 at 1636-37; ECF No. 21-3 at 1641-42, 1644-71.

**B.     Petitioner's Supporting Affidavits & Testimony**

Mrs. Perkins and several of her relatives provided affidavits regarding her condition in December 2015. There are, however, inconsistencies between these affidavits and the contemporaneous medical records. *See, e.g.*, ECF No. 44 ¶ 2. The Special Master held an onset hearing to address these inconsistencies and to inform her ruling on the onset of Mrs. Perkins' symptoms. *See* ECF No. 54 (transcript of onset hearing). In support of her assertion that her GBS symptoms began mid-December, Mrs. Perkins submitted multiple affidavits in advance of the onset hearing – her own affidavit and those of family members. *See* ECF Nos. 10-1, 48-1, 48-2, 48-3, & 48-4. At the onset hearing, only Mrs. Perkins, her daughter, Kistine Uffens, and her son, Kyle Perkins, testified in person. ECF No. 54 at 3 (hearing witness list). After recognizing some confusion on his part regarding when certain events took place, Matt Uffens, Mrs. Perkins' son-in-law, filed a corrected affidavit after the hearing. ECF No. 57.

1. Affidavit & Testimony of Mrs. Perkins

Mrs. Perkins maintains that her GBS symptoms began mid-December. In her affidavit, she stated that, in mid-December of 2005, she "developed symptoms including dizziness, loss of balance, double vision, progressing weakness, and difficulty with speech." ECF No. 10-1 at 1. Petitioner also testified that symptoms of vision problems, dizziness, and feeling off balance began in December 2015. ECF No. 54 at 32:8-11. Mrs. Perkins did not go to a doctor for any of these symptoms, but she stated that she "may have looked it up on WebMD or something." *Id.* at 10:5-11, 32:12-17. Mrs. Perkins did not talk about her symptoms with her husband in

3

December 2015, but she stated that he was "busy at work a lot, and so we weren't together a lot . . . ." *Id*. at 32:22-33:7.

Mrs. Perkins asserts that on December 23, 2015, while driving to the airport, her husband complained about her erratic driving, which she attributed to vision problems. ECF No. 54 at 12:1-6. Mrs. Perkins, her husband, and youngest daughter visited Seattle from December 23, 2015 to January 2, 2016, to spend the holidays with her son Devin and daughter Kistine. *Id*. at 11:12-14, 34:1-21. Kyle, Mrs. Perkins' other son, also flew to Seattle for the holidays. *Id*. at 34:12. Mrs. Perkins described difficulty reading while in Seattle, stating that she "noticed it a lot more constantly while we were on our trip . . . ." *Id*. at 46:1-3. She also claimed difficulty with walking and balance. *Id*. at 12-13. Specifically, she recited problems walking while on a visit to the beach area at Chambers Bay, stating: "I had to really, really be careful, more than I normally do and get assistance from family members that were around." *Id*. at 13:9-11. Her husband told her to go to the doctor, but she did not want to do that while on the trip. *Id*. at 13:16-19. During this trip, Mrs. Perkins held her baby grandson, but could only do so while seated because she "wasn't feeling great." *Id*. at 37:20-25. Mrs. Perkins did not discuss her health with Kistine but believed that Kistine could tell how she was feeling based on Kistine observing her. *Id*. at 38:7-12.

Mrs. Perkins returned from Seattle on January 2, 2016 and visited the doctor for sinus and ear problems on January 4, 2016. ECF No. 54 at 17:10-18. She drove herself to this appointment without issue. *Id*. at 46:11-19. She stated that her ear pain had been present for about a week and became worse on her flight back from Seattle. *Id*. at 17:3-12. Mrs. Perkins was treated by a nurse practitioner and prescribed a Z-pack. *Id*. at 17:20-25, 18:1. Mrs. Perkins testified that she only mentioned her ear and sinus problems at this appointment because the "person that I was seeing was not a medical doctor, and I didn't think that she would be able to help with that anyway." *Id*. at 42:23-25. Mrs. Perkins conceded that she made no effort to see a physician at this time. *Id*. at 43:14-20.

On January 5, 2016, Mrs. Perkins drove from Garden City to Wichita with her teenage daughter to buy her daughter a violin. ECF No. 54 at 18:19-21, 46:20-24. Mrs. Perkins testified that she was fine while driving, but when she got out of the car, she "was walking like [she] was drunk pretty bad." *Id*. at 18:21-24. Mrs. Perkins testified that she was "very dizzy and couldn't walk straight." *Id*. at 19:3-4. On the drive home, Mrs. Perkins' driving became so bad that her teenage daughter made her stop the car so that she could drive home instead. *Id*. at 19:11-15.

### 2. Affidavit of Kim Perkins, Husband

In his affidavit, Kim Perkins, Mrs. Perkins' husband, asserted that he remembered "with exactness the onset of Guillan Barre / Miller Fisher syndrome that Gail[2] Perkins experience beginning in mid-December of 2015." ECF 48-1 ¶ 3. After the December 23, 2015 driving incident on the way to the airport, Kim recalled Mrs. Perkins telling him that her "vision was a little blurry, but thought it was because of the late night with not much sleep." *Id*. ¶ 7. He further stated that when Mrs. Perkins exited the car, she had to steady herself. *Id*. ¶ 8. Kim also stated that Mrs. Perkins "just wasn't herself" while in Seattle. *Id*. ¶ 10. According to Kim, Mrs.

---

[2] Mrs. Perkins goes by "Gail."

Perkins commented that the "menu was blurry and she couldn't read it" while they were out at dinner, which had never happened before. *Id.* ¶ 11. Kim also noticed that Mrs. Perkins' energy level had lessened over the course of the visit. *Id.* ¶¶ 9, 13. While on the trip, Kim asked if they should go to the ER, but Mrs. Perkins declined. *Id.* ¶¶ 12-13. On the way back to Garden City, Kim "noticed [Mrs. Perkins] was holding her hands over her eyes." *Id.* ¶ 14. According to Kim, Mrs. Perkins said "the light was irritating her eyes and the blurriness was intensifying even though she was wearing sunglasses." *Id.* On their return to Garden City, Kim asserts that Mrs. Perkins' symptoms "intensified to the point she was hospitalized . . . ." *Id.* ¶ 15.

### 3. Affidavit & Testimony of Kistine Uffens, Daughter

Mrs. Perkins' daughter, Kistine Uffens, submitted an affidavit and testified in the onset hearing. In her affidavit, she states that Mrs. Perkins got her Tdap vaccination to protect Kistine's new baby. ECF No. 48-2 ¶ 4. Kistine Uffens affirmed that her parents visited Seattle in December 2015. *Id.* ¶ 3; ECF No. 54 at 91:17-19. She testified that Mrs. Perkins' symptoms were not "as evident" at the beginning of their time in Seattle. ECF No. 54 at 95:13-24. Mrs. Perkins' symptoms were not alarming until "as the vacation went on where [they] were doing things more, like five, six days into the trip . . . ." *Id.* Kistine also recalled that, during their time at the beach at Chambers Bay, Mrs. Perkins "wasn't quite normal" because she was walking gingerly and slower. *Id.* at 93:14-20. She testified to thinking during the trip that her mother had "aged quite a bit" and that her eyesight was "extremely off." ECF No. 48-2 ¶ 6. Kistine further noticed that Mrs. Perkins had trouble reading street signs, the television, and labels while out shopping. *Id.* ¶ 7. Mrs. Perkins repeatedly asked Kistine whether she could see things clearly. *Id.* ¶ 8. Kistine further testified that her mother had difficultly reading a menu, even while wearing her reading glasses. ECF No. 54 at 93:6-13.

In her affidavit, Kistine stated that "[Mrs. Perkins] seemed slower on that trip than she usually was. [Mrs. Perkins] walked more carefully and wasn't as quick to get on the floor with the kids as she usually was." ECF No. 48-2 ¶ 9. At the hearing, however, Kistine admitted that Mrs. Perkins held the baby, played on playground equipment, and played games on the floor with the kids during the trip. ECF No. 54 at 101:12-15. Mrs. Perkins was not unable to do anything, she was just not "a hundred percent like she usually was." *Id.* at 101:11-12.

Kistine also recalled her mother complaining about being dizzy while shopping. ECF No. 48-2 ¶ 10. In particular, she remembers Mrs. Perkins saying that she felt dizzy while at Bath & Body Works on January 1, 2016. ECF No. 54 at 101:19-20. Kistine also testified that although she did not have any serious conversations with her mother about her symptoms, she asserted that she told her mother that "you need to get checked out." *Id.* at 94:1-7, 107:1-10. According to Kistine, her mother "wasn't making a big deal out of it" and said she would go to the doctor once home. *Id.* at 107:11-14. Kistine did not speak with her mother again until she was in the hospital and "things were going very poorly." *Id.* at 109:12-15.

### 4. Corrected Affidavit of Matt Uffens, Son-in-Law

Matt Uffens submitted two separate affidavits – one before the hearing and a second corrected affidavit afterwards. *See* ECF Nos. 48-3 & 57-1. Matt originally stated that "after the point of when [Mrs. Perkins] became infected that her balance became severely affected." ECF

5

No. 48-3 ¶ 5. He further recalled that Mrs. Perkins had to hold his arm while walking around Discovery Park and sit after she felt dizzy. *Id*. ¶¶ 6-9. But Matt realized that in his initial affidavit, he confused a July 2016 trip to Discovery Park with the December 2015 trip. ECF No. 57-1 ¶¶ 3-6. In his corrected affidavit, Matt recalled the December 2015 visit to Chambers Bay, stating that it took the family "some time" to complete the walking trail. ECF No. 57-1 ¶¶ 7-12.

### 5. Affidavit & Testimony of Kyle Perkins, Son

Prior to December 2015, Kyle saw Mrs. Perkins three to six times per year. ECF No. 54 at 69:15-18. He testified that prior to the Tdap vaccination, Mrs. Perkins was "generally a healthy person." *Id*. at 65:19-24. Kyle did not recall her ever complaining about problems with balance or dizziness prior to the December 2015 trip to Seattle. *Id*. at 66:13-17. During this trip, Kyle was not with his parents twenty-four hours each day. *Id*. at 77:10-13.

Kyle stated that his mother was experiencing "slower than normal motor movements, vision impairment, rapid fatigue, dizziness, and taking extra measures to maintain balance" during Christmastime 2015. ECF No. 48-4 ¶ 2. Further, he stated that "motor movements would take more concentration than what was normal for her." *Id*. She appeared "as if she had to think about what she was going to do next." *Id*. ¶ 4. Kyle also testified that Mrs. Perkins' motor movements took longer, and she became easily fatigued. ECF No. 54 at 68:18-20. Kyle recalled that, during the trip, he noticed his mother "grabbing onto railings and counter, taking unusual extra precautions to stabilize herself, and do it with unusual frequency." ECF No. 48-4 ¶ 8. Kyle further stated that Mrs. Perkins was using railings while walking up stairs, something she did not do before. ECF No. 54 at 70:6-9.

Kyle stated that he noticed Mrs. Perkins also had vision issues: "she would kind of stare at words a little bit and like just look at the pages for longer." ECF No. 54 at 67:12-18. He did not recall any other instances of vision problems. *Id*. at 68:2-3. Kyle affirmed that during the two weeks in December 2015, his mother was "far from her normal self." ECF 48-4 ¶ 9. Kyle did not speak with his mother about his concerns, but he might have asked whether she was okay. ECF No. 54 at 69:1-9.

After the trip, Kyle spoke on the phone with his mother while she drove his sister to Wichita, recalling that she said she had to pull over. ECF No. 54 at 71:7-11. He did not speak with either of his parents again until he found out that his mother would be in the hospital longer. *Id*. at 71:12-14. Kyle visited his mother while she was at Porter. *Id*. at 71:16-21. He could not recall whether they had any specific conversations about the onset of her symptoms. *Id*. at 72:13-19. Kyle testified that doctors mentioned different vaccines when trying to figure out Mrs. Perkins' health problems, but he was not present for this conversation. *Id*. at 85:3-22.

### C. Special Master's Finding

On April 6, 2017, Mrs. Perkins filed her petition pursuant to the Nation Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq*. ("Vaccine Act"). ECF No. 1. Mrs. Perkins alleges that as a result of her Tdap vaccination on November 2, 2015, she developed the Miller-Fisher variant of GBS. *Id*. ¶ 8. Mrs. Perkins asserts that her Tdap vaccination caused her injury, not that she has suffered from any Vaccine Table Injury. *See id*. Respondent filed its

6

Rule 4(c) Report on December 4, 2017, asserting that "petitioner has not offered any evidence to show that the onset of her alleged vaccine injury (at least eight weeks after vaccination) occurred in a time frame within which vaccine causation could be ascribed." ECF No. 15 at 8. The Special Master held an onset hearing on November 5, 2019 to determine the onset of Mrs. Perkins' GBS symptoms, as there were noted discrepancies between Mrs. Perkins' affidavit and her contemporaneous medical records.

Ultimately, the Special Master found that "[Petitioner's] testimony did not rise to the level of persuasiveness necessary to overcome the presumption of accuracy afforded to contemporaneous medical records . . . ." ECF No. 60 at 20. Specifically, the Special Master held that "petitioner's symptoms of dizziness, imbalance, double vision, and ataxia, associated with her diagnosis of Miller-Fisher variant GBS, began after January 4, 2016." *Id.* at 23. The Special Master directed Mrs. Perkins to file a new expert report on causation based on this onset date, or, in the alternative, a status report on how she intended to proceed. *Id.* During a status conference on February 26, 2021, Mrs. Perkins' counsel advised that her expert could not support a theory of causation based upon the onset ruling's conclusion that her neurological symptoms began in January 2016. *See* ECF No. 64. On March 9, 2021, Mrs. Perkins filed a Motion for Dismissal because her expert could not support causation. ECF No. 66. Mrs. Perkins reserved her right to file a Motion for Review pursuant to Rule 23 of the Rules of the Court of Federal Claims. *Id.* On March 9, 2021, the Special Master dismissed Mrs. Perkins case for insufficient proof. ECF Nos. 68 (sealed version) & 72 (public version re-issued April 5, 2021). Mrs. Perkins timely filed a motion for review on March 31, 2021. ECF Nos. 69 & 70. Respondent filed its response on April 30, 2021. ECF No. 73. After reviewing the filings, the Court is prepared to rule.

## II.     DISCUSSION

### A.     Jurisdiction & Standard of Review

The United States Court of Federal Claims exercises jurisdiction to review vaccine decisions pursuant to § 300aa-12(e)(1) of the Vaccine Act. In reviewing a special master's decision, this Court may:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2). "Findings of fact of the special master are reviewed under the arbitrary and capricious standard, conclusions of law are reviewed under the 'not in accordance with law' standard, and discretionary rulings are reviewed under the abuse of discretion standard." *Broekelschen v. Sec'y of Health & Human Servs.*, 89 Fed. Cl. 336, 343 (2009), *aff'd*,

7

618 F.3d 1339 (Fed. Cir. 2010) (citations omitted). When evaluating factual findings of the special master, this Court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011); *see also Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) ("[O]n review, the Court of Federal Claims is not to second guess the Special Master[']s fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process."). "Rather, as long as a special master's finding of fact is 'based on evidence in the record that [is] not wholly implausible, [the Court is] compelled to uphold that finding as not being arbitrary or capricious.'" *Porter*, 663 F.3d at 1249 (first alteration in original and second alteration added) (quoting *Cedillo v. Sec'y of Health & Human Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010)). Where "the special master has 'considered the relevant evidence of record, drawn plausible inferences, [and stated] a rational basis for the decision,' reversible error is extremely difficult to establish." *Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012) (quoting *Hines v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

### B. Vaccine Act Legal Standard

To receive compensation under the Vaccine Act, petitioner must prove either 1) that she suffered a "Table Injury" – *i.e.*, an injury falling within the Vaccine Injury Table – that corresponds to the vaccination received, or 2) that she suffered an injury that was caused-in-fact by a vaccine. *See* 42 U.S.C. §§ 300aa-13(a)(1)(A) & 300aa-11(c)(1). Here, Petitioner does not allege, and the record does not show, that she suffered a "Table Injury" caused by the Tdap vaccination. *See* Vaccine Injury Table, 42 U.S.C. § 300aa-14. Therefore, Petitioner's sole argument is that the Tdap vaccination caused her injury.

In *Althen v. Secretary of Health & Human Services*, the Federal Circuit articulated a three-part test outlining a petitioner's burden to establish causation-in-fact under the Vaccine Act. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). To prove causation-in-fact, a petitioner must:

> [S]how by preponderant evidence that the vaccination brought about her injury by providing (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.*; *see also Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1355 (Fed. Cir. 2019) (holding that a petitioner must "prove[] all three *Althen* prongs by a preponderance of the evidence"); 42 U.S.C. § 300aa–13(a)(1)(A) (Petitioner must prove causation-in-fact "by a preponderance of the evidence."). The three prongs "must cumulatively show that the vaccination was a 'but-for' cause of the harm, rather than just an insubstantial contributor in, or one among several possible causes of, the harm." *Flores v. Sec'y of Health & Human Servs.*, 115 Fed. Cl. 157, 162 (Fed. Cl. 2014) (quoting *Pafford v. Sec'y of Health & Human Servs.*, 451

F.3d 1352, 1355 (Fed. Cir. 2006)). But a petitioner is not required to establish the causation to a scientific certainty:

> Causation in fact under the Vaccine Act is thus based on the circumstances of the particular case, having no hard and fast *per se* scientific or medical rules. The determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is "logical" and legally probable, not medically or scientifically certain.

*Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). The Federal Circuit "has interpreted the preponderance of the evidence standard referred to in the Vaccine Act as one of proof by a simple preponderance, of more probable than not causation." *Althen*, 418 F.3d at 1279 (internal citation and quotation marks omitted). The Vaccine Act permits proof of causation through "the use of circumstantial evidence envisioned by the preponderance standard." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006) (internal citation and quotation marks omitted). Petitioner's claim must be "substantiated by medical records or medical opinion." *Althen*, 418 F.3d at 1279.

### C. The Special Master's finding that Petitioner's GBS symptoms began after January 4, 2016 is neither arbitrary nor capricious.

Mrs. Perkins' sole objection on review is that the Special Master erred in concluding the onset of Mrs. Perkins' Miller-Fisher variant GBS symptoms occurred after January 4, 2016. ECF No. 70 at 2, 7. Mrs. Perkins asserts "the Special Master's decision on the date of onset is arbitrary because it is contrary to the record and/or runs counter to the evidence." *Id.* at 7. Mrs. Perkins' position is without merit because her argument is merely a complaint about how the Special Master decided to weigh the evidence before her – choosing to give greater weight to the medical records over affidavits and testimony presented by Petitioner in accordance with existing precedent. When reviewing factual findings of special masters, the law is well-settled that this Court is not to reweigh the evidence. *E.g., Porter*, 663 F.3d at 1249. This Court is highly deferential to the special master's factual findings, particularly so when the special master has "considered the relevant evidence of record, drawn plausible inferences, and articulate[d] a rational basis for the decision." *Hines*, 940 F.2d at 1528.

Here, the Special Master took care to consider the evidence before her and provided a detailed explanation of her consideration of that evidence in her twenty-four page onset ruling. The Special Master recognized conflicts between Mrs. Perkins' affidavit and her medical records early in this case. During the initial status conference, the Special Master provided her tentative findings and conclusions. *See* ECF No. 37. Here, the Special Master explained to the Parties that based on her initial assessment of their submissions, "there is a discrepancy between the onset of petitioner's symptoms as presented in petitioner's affidavit and Dr. Axelrod's reports, and the onset of petitioner's symptoms as recorded in the contemporaneous medical records." *Id*. at 3. The Special Master also explained her view that the contemporaneous records would likely carry more weight than Mrs. Perkins' affidavit or testimony. *Id*. While the Special Master indicated she could rule based on the records, she gave Mrs. Perkins time to consult with her expert before determining how to proceed. Mrs. Perkins requested the onset hearing so that she

could provide live testimony to address the inconsistency between her affidavit and medical records regarding the onset of symptoms. *See* ECF Nos. 38 ¶ 4 & 44 ¶ 2.

Between her onset ruling and final decision, the Special Master thoroughly addressed her reasoning for placing more weight on the medical records and discounting statements in the affidavits and testimony. First, the Special Master found that the testimony and affidavits presented by Mrs. Perkins failed to overcome the medical records. "Medical records created contemporaneously with the events they describe are presumed to be accurate and 'complete' such that they present all relevant information on a patient's health problems." ECF No. 72 at 18 (citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)). The belief that patients provide accurate information to medical professionals for their own benefit is well settled. In the present case, the Special Master found:

> The medical records document various dates of onset for ear pain and sore throat, ranging from December 23, 2015 to January 2, 2016. However, the medical records consistently document petitioner's reporting the onset of her dizziness and vision disturbance after January 4, 2016, which over the next three days escalated to include ataxia, retro-orbital pain, diffuse body tingling, and increased numbness of her entire body, particularly her face and jaw, causing difficulty eating and speaking.

ECF No. 60 at 20 (internal citations omitted). The medical record supports these statements. The Special Master recognized that Mrs. Perkins herself reported to her doctors that her symptoms began in January. Mrs. Perkins made these statements during her time at St. Catherine's and a February 2016 visit to the ER. *Id.* at 22. Further, "[t]he medical records repeatedly noted that petitioner was alert and a great historian. *See, e.g.*, [ECF No. 8-3] at 1153 (nursing note stating that petitioner was "very alert and exhibits very precise memory of past few weeks events"); [ECF No. 8-4] at 1414 ("Patient is alert and oriented[,] no confusion noted . . . ."). " *Id.* The Special Master further noted that prior to these events, during her January 4 visit to Siena, her medical providers specifically found Mrs. Perkins to be neurologically intact. *Id.* at 21 (citing ECF No. 54 at 46; ECF No. 8-6 at 1586-87). Following the well-documented medical history over the statements of Mrs. Perkins' family cannot be considered counter to the evidence. The Special Master merely chose what she determined to be the better evidence, and this Court is not able to go against that determination.

Second, the Special Master found the contemporaneous medical records more reliable because of the risk of confusion when witnesses were recalling events from four years prior. As the Special Master explained, "[w]hile the witnesses were candid and undoubtedly believed their testimony to be true, as evidenced by Mr. Uffens' confusion, the petitioner and her family seem to have conflated the July 2016 trip petitioner made to Seattle, five months after suffering from GBS with her visit in December 2015." ECF No. 60 at 20. Specifically, Matt had to correct his affidavit following the onset hearing because he recognized that his original affidavit confused events that he thought happened in December 2015 but later recalled actually happened in July 2016. ECF No. 60 at 21 (citing to ECF No. 57-1 at 1-2). And the Special Master recognized that "[t]he testimony about the trip to Chambers Bay [regarding Mrs. Perkins' difficulty moving and dizziness] is further complicated by the corrected affidavit submitted by Mr. Uffens in which he

10

admitted to confusing the trip to Chambers Bay in December 2015 with a trip to Discovery Park in July 2016, after petitioner's diagnosis of Miller-Fisher variant GBS." *Id*. And in some cases, the witnesses' statements were inconsistent with each other as to when Mrs. Perkins' symptoms began. ECF No. 60 at 21 (discussing inconsistencies between testimony of various witnesses regarding onset).

The Special Master also recognized Mrs. Perkins' own confusion. Specifically, the Special Master found that "Petitioner also confused these two trips when she testified that she went on the water slides, even though she did not feel like it, because she wanted to participate with her grandchildren." ECF No. 60 at 21 (citing ECF No. 54 at 13). Based upon these instances, the Special Master concluded "[t]his raises the concern that the other witnesses also conflated the two trips and incorrectly placed their recollections of petitioner's debility in December 2015 rather than July 2016 after her illness." *Id*. Considering this confusion, it is not arbitrary and capricious for the Special Master to credit the medical records over such testimony, particularly when "[n]either petitioner nor her family expressed any concern at that time for petitioner's health to her or to each other, and no one thought it was necessary to take petitioner to urgent care or an ER." *Id*. (citing ECF No. 54). Thus, the Special Master reasonably concluded that this confusion "raises the concern that the other witnesses also conflated the two trips and incorrectly placed their recollections of petitioner's debility in December 2015 rather than July 2016 after her illness." ECF No. 60 at 21. This factual finding is supported by the record and it is not for this Court to disturb it.

Third, while Mrs. Perkins contends that testimony clearly shows her onset of symptoms in December, the Special Master reasonably concluded that this testimony shows an onset of fatigue, not her dizziness. ECF No. 60 at 21. For example, Kyle testified that during their visit in December 2015 that he "never recall any complaints or observing any problems, challenges with dizziness." ECF No. 54 at 66:16-17. And he further testified that what he noticed most about his mother during their visit was when the family was engaged in activities, "[s]he would get tired and she would have to stop." *Id*. at 68:14. Other testimony about Mrs. Perkins' dizziness involved a visit to Chambers Bay. *Id*. at 93:14-22. But as explained above, the Special Master found that noted confusion regarding the December 2015 Chambers Bay and July 2016 Discovery Park visits called into question whether additional witnesses were also confusing the two trips. *See* ECF No. 60 at 20-21. Petitioner also asserts that her difficulty driving to the airport when she and her family were flying to Seattle on December 23, 2015 demonstrates that her symptoms started in December rather than January, which the Special Master purportedly disregarded. ECF No. 70 at 3. According to Mrs. Perkins, while she was driving her vision was blurry and her husband asked her to pull over and let him drive because she was driving erratically. *Id*. (citing ECF No. 54 at 11-12). Further, she had to steady herself on the car when she got out and needed her husband to steady her in the airport. *Id*. (citing ECF No. 48-1). Contrary to Mrs. Perkins' claim, the Special Master did not dismiss this evidence. ECF No. 70 at 7. Rather, the Special Master concluded that Mrs. Perkins' claims of dizziness and inability to drive in December were inconsistent with later events. This conclusion is supported in the record.

Mrs. Perkins went shopping at a Target store on January 3, 2016 without incident. ECF No. 60 at 21 (citing ECF No. 51-3 at 1). She drove herself to her January 4, 2016 Siena appointment without incident. *Id*. (citing ECF No. 54 at 46:16-19 ("Q: And you don't recall

11

having any trouble with that particular drive on January 4th to get yourself to this medical appointment? A: No.") (additional citation omitted). And during this appointment, Mrs. Perkins never reported that she was experiencing dizziness, vision problems, or difficulty with balance during her visit to Siena. *Id*. (citing ECF No. 8-6 at 1586-87). Mrs. Perkins testified that she did not raise any symptoms during her visit to Siena other than her ear and sinus issues because the "person that I was seeing was not a medical doctor, and I didn't think that she would be able to help me with that anyway. So I didn't even bring it up." ECF No. 54 at 42:23-43:1; *see also* ECF No. 60 at 21. The Special Master recognized, however, that Mrs. Perkins never sought to see a physician while she was at Siena to treat any of these symptoms, which reasonably calls into question the assertion that she was suffering from those symptoms at that time. ECF No. 60 at 21 (citing ECF No. 54 at 42-43). More importantly, Mrs. Perkins drove herself and her teenage daughter three hours to Wichita on January 5, 2016. *Id*. (citing ECF No. 54 at 18, 46-47). The Special Master reasonably concluded that "[i]t strains reason that petitioner would choose to drive three hours to Wichita with her child in the car if she had been suffering from dizziness, vision problems, and difficulty with walking and balance for over three weeks. It stands to reason, that as she stated, she did not feel well upon arrival in Wichita and this is when *these symptoms* began." *Id*. at 21-22 (emphasis added). There was nothing irrational about the Special Master's conclusions based on this record.

Finally, the Special Master explicitly laid out the timeline, as she found it to have occurred, citing to numerous points in the record:

> 1. Toward the end of a visit to Seattle over Christmas and New Year's 2015, around December 28-30th, *see* [ECF No. 54 at] 96 (Ms. Uffens's statement that petitioner seemed fine until five or six days into the Seattle trip), petitioner developed ear pain and a sinus infection, which significantly worsened on January 2, 2016 when she flew home. *See* [*id*. at] 55 (Petitioner's statement that her symptoms significantly worsened on January 2, 2016); [ECF No. 8-2] at 510 (Petitioner's report that she was in her usual state of health until January 2, 2016, when she flew home from Seattle); [ECF No. 8-6] at 1587 (Petitioner's report that she recently flew back from Seattle and her ear and sinus problems became worse).
>
> 2. On January 4, 2016, petitioner presented to Siena with ear and throat pain, was diagnosed with a double ear infection and prescribed a Z-pack; she did not report dizziness, double vision, or ataxia at this time. [ECF No. 8-6] at 1587.
>
> 3. On January 5, 2016, petitioner drove three hours from Garden City to Wichita and, upon her arrival in Wichita, developed dizziness, double vision, and ataxia and was unable to drive home. Her 15-year-old daughter drove home. [ECF No. 54 at] 18-19, 48-49.
>
> 4. On January 6, 2016, petitioner presented to the ER at St. Catherine's, reporting a sore throat and ear pain treated by her PCP

> on January 4, but had now developed dizziness, ataxia, fever, double vision, retro-orbital pain, and diffuse tingling throughout her body. [ECF No. 8-4] at 1298. She was admitted for bilateral mastoiditis and otitis media labyrinthitis.
>
> 5. While in the hospital, she developed increased numbness of her entire body and was transferred to Porter, where she was diagnosed with Miller-Fisher variant GBS. [*Id.*] at 1298-1300, 1316, 1414; [ECF No. 8-2] at 493, 508.

ECF No. 60 at 22-23. The Special Master also made determinations on each of Mrs. Perkins' symptoms individually. *See id.* at 6 n.9 & 7 n.14-15. She did not make a sweeping generalized finding contrary to the record, as Mrs. Perkins suggests. In other words, the Special Master did not ignore or discount the symptoms that Mrs. Perkins put before her regarding December 2015. Instead, the Special Master addressed those symptoms and found them to be connected to the ear infections that initially led Mrs. Perkins to seek treatment on January 4, 2016. But the Special Master differentiated these symptoms from the neurological symptoms that are connected to GBS and found those to have begun after January 4, 2016. The Special Master supported her findings with evidence throughout the record. And the Special Master found significant certain undisputed facts from the mid-December 2015 to January 4, 2016 period. Because this Court is not to reweigh the evidence, it is not for this Court to say these factual findings are incorrect when they find support in the record.

### III. CONCLUSION

The Special Master's onset ruling is twenty-four detailed pages, wherein she comprehensively considers the record, including affidavits and testimony in reaching her conclusion, which she explains. *See* ECF No. 60. As explained above, she did not "arbitrarily dismiss[] clear and uncontroverted evidence from 5 witnesses in favor of recorded medical history that was at best ambiguous." ECF No. 70 at 7. To the contrary, she considered in detail each of the witnesses' affidavits and testimony, and explained why inconsistencies in this evidence led her to weigh more heavily the contemporaneous medical records in determining the onset of Mrs. Perkins' neurological symptoms. The contention that she did not consider the evidence before her is belied by the Special Master's opinion. Based on this record, the Special Master's reliance on the contemporaneous medical records was neither arbitrary nor capricious. She thoroughly addressed each facet of evidence before concluding that the onset of Mrs. Perkins' symptoms occurred after January 4, 2016. *See* ECF No. 60.

Therefore, the Court **SUSTAINS** the Special Master's decision and **DENIES** the Petitioner's Motion for Review. The Clerks Office is directed to enter judgment accordingly.

IT IS SO ORDERED.

<div style="text-align: right;">
s/ Edward H. Meyers<br>
Edward H. Meyers<br>
Judge
</div>